UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LIAM CHAPP,

      Plaintiff,

                                        Case No. 1:23-cv-416

v.

                                        Hon. Jane M. Beckering

202 LAKE STREET PARTNERS, LLC,
et al.,

      Defendants.

_____/

### AMENDED OPINION AND ORDER[1]

Plaintiff Liam Chapp filed this action against Defendants 202 Lake Street Partners, LLC ("LSP"), and Tony Cutler, alleging that while he was a minor who was employed at the Lake Street Pub (the "Restaurant"), he was sexually harassed and sexually assaulted by Cutler and that Cutler sent him sexualized text messages. (ECF No. 1.) Chapp brings claims under Title VII of the Civil Rights Act and state law. LSP has filed a motion for summary judgment on Chapp's Title VII and state law discrimination claims. (ECF No. 59.) Cutler has filed a separate motion for summary judgment on Chapp's state law tort claims. (ECF No. 57.) For the following reasons, the Court grants LSP's motion regarding Chapp's Title VII and state-law discrimination claims and declines to exercise supplemental jurisdiction over Chapp's remaining state law claims.

---

[1] The Court has amended the Opinion and Order to reflect, consistent with the Court's analysis, that Plaintiff's state law anti-discrimination claim is properly dismissed with prejudice.

# I. BACKGROUND

## A. Factual Background

In June of 2018, LSP opened the Restaurant in Boyne City, Michigan, near Lake Charlevoix.  (Tate Decl. ¶¶ 2–3, ECF No. 60-4.)  Given the Restaurant's location and Northern Michigan's "influx of tourists" in the summer, the Restaurant experiences an uptick in patrons during the warm summer months.  (*Id.* ¶¶ 25–26.)  This seasonal uptick was more pronounced than usual in the summer of 2021 because, in June of 2021, Michigan's governor announced that restaurants could return to 100% capacity after a period of capacity restrictions.  (*Id.*)  LSP therefore decided that they would accelerate their hiring process to quickly hire more employees. (*Id.* ¶ 30.)

Generally, LSP employed one general manager and one assistant manager.  (*Id.* ¶¶ 6, 8.) Christine Tate, who was the Restaurant's general manager in June of 2021, had authority to hire, issue discipline, and schedule lower-level employees.  (*Id.* ¶¶ 6–7.)  Jessica Mulvaney, who was the Restaurant's assistant manager in June of 2021, had authority to assist lower-level employees with tasks, help conduct interviews, complete new hire paperwork, and assist with payroll processing.  (*Id.* ¶¶ 9–11.)  But given the Restaurant's need for more employees in the summer months, LSP also hired "floor managers."  (*Id.* ¶ 12.)  Floor managers typically did not "have the authority to hire, fire, or discipline employees," or process employment actions.  (*Id.* ¶ 13.)  Floor managers were hired to "participate in and help lead the daily operations of the Restaurant."  (*Id.* ¶ 14.)  Still, "[i]f an issue [arose] . . . and the General Manager [was] not immediately available, a floor manager . . . [could] respond in such moment to address the situation."  (*Id.* ¶ 18.)  And as LSP was accelerating their hiring process, Tate was also on maternity leave, so LSP gave floor managers authority to "hire" interested candidates, and "interview, process, and onboard new employees."  (*See id.* ¶ 30.)

LSP hired Cutler as a floor manager for the summer of 2021.  (*Id.* ¶ 16.)  Cutler was a regular seasonal worker at the Restaurant.  (*Id.* ¶ 17.)  As of June 2021, he was approximately thirty-eight years old.  He also worked as a high school teacher and government employee.  (*Id.* ¶ 17.)

LSP hired Liam Chapp in June of 2021, when he was sixteen years old.  (Chapp Dep. 74–77, ECF No. 60-6; Chapp Decl. 8, ECF No. 67-1.)  Chapp sought a job at the Restaurant because his brother, his friend Scotty Haley, and other friends worked there.  (*Id.* at 66–67.)  On June 13, 2021, his dad drove him to the Restaurant to get a job application.  (*Id.* at 72.)  Around the time of the lunch hour, Chapp walked through the front door of the Restaurant and approached Haley at the host table to get an application.  (*Id.*)  Chapp began filling it out by the host table.  (*Id.*)  Cutler, who was a floor manager at the time, saw Chapp completing the application.  (*See id.*; Tate Decl. ¶ 16.)  Cutler approached Chapp and introduced himself as one of the managers at the Restaurant. (Chapp Dep. 86.)  Cutler told Chapp to follow him to a back corner of the Restaurant's dining area and let Chapp complete the application.  (*Id.* at 73.)  After Chapp finished the application, Cutler interviewed Chapp for about fifteen to twenty minutes.  (*Id.* at 73–74.)  He asked Chapp what experience he had and went over Chapp's employment application.  (*Id.*)  One of Cutler's last questions for Chapp was when he could start.  (*Id.*)  Chapp said he was available to begin immediately.  (*See id.*)  They then shook hands and Chapp left.  (*Id.* at 75.)  Chapp testified that he was under the impression he had the job.  (*Id.*)

Chapp then downloaded an application on his phone that would allow Restaurant management to communicate his scheduled shifts.  (*Id.*)

On June 16, 2021, approximately three days after his interview with Cutler, Chapp worked his first shift at the Restaurant.  (*Id.* at 88; *see* Chapp Employment Understanding and Acknowledgment Form, ECF No. 60-8.)  He recalls that on his first day, he met with Mulvaney,

and she showed him "how everything work[ed]", how to clock in, and introduced him to his future coworker.   (Chapp Dep. at 77.)   Chapp testified that he did not remember receiving the Restaurant's employee handbook, sexual harassment policy, or anti-discrimination policy at this time.   (*Id.* at 86–88.)   But he did testify that he signed an "Employment Understanding and Acknowledgement" (EUA) form that acknowledged he had received a copy of LSP's Employee Handbook.   (*Id.* at 88; Chapp Employment Understanding and Acknowledgment Form, PageID.358.)   The first sentence of the one-page EUA states: "I acknowledge that I have received a copy of the Lake Street Pub Employee Handbook and that it is my responsibility to read and know the contents of the Handbook." (*Id.*)   The last sentence of the EUA states: "I hereby acknowledge that I have received my employee Handbook describing these policies and that I am aware of my obligation at all times to fully comply with the responsibilities imposed upon me as a condition of my employment. I freely, knowingly and voluntarily provide my signature as set forth below." (*Id.*)

Included in the employee handbook was LSP's sexual harassment and anti-discrimination policy (the "Policy").   (*See* Discrimination and Harassment Policy, ECF No. 60-7, PageID.354–56.)   The Policy states that in the event of having a complaint of sexual harassment or discrimination, the employee should report such conduct in writing to the Restaurant manager or Steve Rossi. (*Id.*, PageID.355.)   Chapp acknowledged in his deposition that when he started work, somebody talked with him about what to do if he had a problem and who to contact, which he acknowledged was to reach out to one of the managers.  (Chapp dep. at 89.)

Around a month into the job, Chapp was bussing tables, and working "expo."  (Chapp Decl. ¶ 9, ECF No. 67-1.)  Working "expo" means being in a role in which the employee "assist[s] servers by assembling orders on trays for delivery to customer tables."  (LSP Br. in Supp. of Summ.

J., ECF No. 60, PageID.280; Chapp Dep. 219.)  Working expo requires being in an intermediate space between the kitchen and dining room.  (*See* Chapp Dep. 219.)

On July 11, 2021, Chapp was working expo.  (*Id.*)  According to Chapp, Cutler came back to the expo area to help.  (*Id.* at 122–23.)  Cutler began working on the left-hand side, while Chapp was on the right.  (*See id.* at 220–21.)  While putting food on the trays, Cutler brushed the back of his hand against the top of Chapp's penis.  (*Id.*)  Thinking that it was an accident, Chapp "took a step to the right."  (*Id.* at 123, 220–21.)  But Cutler brushed the back of his hand against the top of Chapp's penis, again.  (*Id.* at 123.)  As a result, Chapp left the expo area to do something else. (*See id.*)

Though Cutler was approximately twenty-two years older than Chapp, Chapp considered him a close friend.  (*Id.* at 124.)  Cutler first reached out to Chapp over text message around the time when Chapp began working at the Restaurant.  (*See* Cutler and Chapp Text Messages, ECF No. 60-14, PageID.385.)  The two would regularly text, typically late at night after Chapp finished a shift.  (*See* Chapp Dep. 95–96.)  Cutler also assisted Chapp with non-work-related matters.  (*See id.* at 125.)  Specifically, Cutler once helped Chapp get his car running after a late shift.  (*Id.*)

On July 18, 2021, Chapp was in Hawaii for a memorial for his deceased grandfather. (*Id.* at 93.)  Chapp and Cutler were communicating via text message.  (Tate and Chapp Text Messages, ECF No. 60-15; Additional Text Messages from Cutler, ECF No. 60-17.)  On this occasion, Cutler's text messages to Chapp became sexually suggestive in nature:

> Cutler: I'm sure Hawaii wifi sucks, #calledout
> Chapp: [Photo of Chapp with a surfboard standing next to another male]
> Chapp: Proof, no WiFi on a beach [laughy face emoji]
> Cutler: Shirtless Liam #screenshot
> . . .
> Cutler: Confession
> Cutler: I only hired you because of the shorts you wore at your interview
> Cutler: Lol #RealPedoSpeak
> . . .

Chapp: Haha is that really why [laughy face emojis]

. . .

Cutler: Omg my response so inappropriate and so gay

. . .

Chapp: Your good

Chapp: You should see scotties responses sometimes

. . .

Chapp: I swear I'll jus ask him [about] his day . . . he will say "better now that we're talking"

. . .

Cutler: Maybe he's into you [shrug emoji]

Chapp: Eh, can't blame him

Cutler: Neither can I [heart eyes emojis]

. . .

Cutler: Are you gay?

. . .

Cutler: You're like this jock stud who you'd think is 1000000% straight. But then kinda like wouldn't be surprised if he went the other way.

. . .

Cutler: I'm going to never drink and text again especially to a MINOR EMPLOYEE

. . .

Cutler: I wish this convo was on snap so it would be gone tomorrow [laughy face emojis]

Chapp: Your good man, just friends talking

Chapp: Ya think if I was afraid or uncomfortable I would still be talking

(Tate and Chapp Text Messages, PageID.397–400; Additional Text Messages from Cutler, PageID.418–26.)

The next day, Chapp told Tate and his parents about these text messages.  (Chapp Dep. 94–95.)  He notified Tate via Facebook Messenger that Cutler had touched his groin area the week before and that, given the text messages, he was uncomfortable.  (Tate and Chapp Text Messages, PageID.398–400.)  Chapp sent Tate some screenshots of the text messages.  (*Id.*)  Tate responded within two hours of receipt and stated that LSP would investigate, and that it took his allegations seriously.  (*Id.*)  She also told Chapp to send her any more information or concerns Chapp may have.  (*Id.*)  Tate then notified the Restaurant's ownership.  (Tate Decl. ¶ 31.)

A couple days later, Tate contacted Chapp via Facebook Messenger.  (Tate and Chapp Text Messages, PageID.404–07.)  Tate asked if anyone saw Cutler touch him.  (*Id.*)  Chapp said no, but stated other people were around when it happened.  (*Id.*)  She then asked detailed questions about where exactly they were situated in the expo area when the incident occurred, who else was working that night, and what time it had happened.  (*Id.*)  And she asked if she could contact his parents regarding the matter.  (*Id.*)  Chapp provided her with his parents' information.  (*Id.*)

On July 22, 2021, LSP contacted Cutler.  LSP informed Cutler that Chapp had lodged a complaint against him regarding the incident and sexualized text messages.  (Tate Decl. ¶ 32; Cutler Interview Notes, ECF No. 60-18.)  They notified him that he should cease contact with the Restaurant and its employees pending the investigation.  (*Ibid.*)  Additionally, LSP management informed Cutler that the process may take an extended period of time due to Chapp being in Hawaii for a couple of weeks.  (*Id.*)

Approximately five days later, LSP concluded its investigation, electing to terminate Cutler's employment.  (Notes of Cutler Termination, ECF No. 60-19, PageID.431.)  That day, LSP communicated to Cutler that his employment with LSP was terminated.  (*Id.*)  Cutler requested that LSP publicize his termination as a "voluntary resignation," which it did.  (*Id.*)

The same day, Chapp contacted Tate concerning Cutler's termination/resignation.  (ECF No. 60-20, PageID.433.)  Tate responded that she would like to set up a meeting with Chapp, his parents, and LSP management to address the situation and next steps.  (*Id.*)  She also asked Chapp if he would like to continue working at the Restaurant.  (*Id.*, PageID.435.)  He said he needed some time to think about it.  (*Id.*, PageID.435–438.)  Chapp asked for a week off after he returned from Hawaii to decide whether to keep working, and the Restaurant obliged, allowing him to remove himself from his shift assignments.  (*Id.* at PageID.435-436).  The next week, he asked for an additional week off, which the Restaurant obliged.  (*Id.*, PageID.439).  Chapp eventually decided

7

against coming back but did not inform LSP why at the time; he avers now, however, that it was because he knew Cutler "lived next door" and frequented the Restaurant.  (*See* Chapp Dep. 98.)

## B. Procedural History

Chapp filed his complaint on April 24, 2023.  He pleads three counts against LSP, one count of sex discrimination in violation of Title VII (Count I), one count of gender discrimination in violation of the Elliott Larsen Civil Rights Act ("ELCRA") (Count II), and one count of hostile work environment in violation of Title VII (Count III).  He also pleads counts of assault and battery (Count IV) and intentional infliction of emotional distress (Count V) against Cutler.

Defendants filed their motion for summary judgment in late December of 2024 and early January of 2025.  Defendants ask for summary judgment on all counts.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "Courts consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013).  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

## III. ANALYSIS

### A. Chapp's Declaration

Before the Court begins analyzing their arguments for summary judgment, the Court addresses LSP's sham affidavit argument.

Chapp attached his declaration to his response to Defendants' motions for summary judgment. Chapp was also previously deposed. Chapp's declaration states that he did "not recall ever seeing or receiving a Pub Employee Handbook" and did "not recall ever seeing or receiving a sexual harassment policy." (Chapp Decl. ¶¶ 13, 14.) The affidavit further states that his "schedules, duties, and work times were set, controlled, and overseen by Mr. Cutler." (*Id.* ¶ 11.)

In his deposition, as noted above, Chapp testified that he signed the Restaurant's EUA, acknowledging that he received and understood the contents of its employee handbook. (*See* Chapp Dep. 88–91.) The employee handbook included the Policy. (Discrimination and Harassment Policy, PageID.354–56.) Chapp testified that he did not think he would have signed the acknowledgment form if he had not been given the handbook. (Chapp Dep. at 88.) In addition, he testified that he received notification of his assigned shifts via a cell phone application. (*See id.* at 76–77.) LSP, therefore, seeks to strike paragraphs 11, 13, and 14 of Chapp's declaration.

The sham affidavit doctrine provides that a party may not file an affidavit that directly contradicts earlier testimony after a motion for summary judgment has been made. *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016). "If the affidavit directly contradicts prior sworn testimony, it should be stricken 'unless the party opposing summary judgment provides a persuasive justification for the contradiction.'" *Id.* (quoting *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)). "The rationale behind the doctrine . . . is simple: if a party who has been examined at length [under oath] could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (internal quotation omitted).

Chapp expressly testified that he signed an acknowledgement form affirming that he had received, read, and understood the contents of the Restaurant's employee handbook, which included the Policy, and he did not think he would have signed the acknowledgment form if he

had not, in fact, been given the handbook. While Plaintiff is not now affirmatively claiming he never received the handbook, he is attempting to create a question of fact where none realistically exists. Therefore, the Court disregards Plaintiff's declaration on this point. But the Court declines to strike paragraph 11 because averring that Cutler set and coordinated his shifts does not contradict his testimony that he received notification of his shifts through the cellphone application. In fact, as discussed *infra*, Chapp would reach out to Cutler regarding his shifts—for instance, Chapp told Cutler when he was estimated to arrive for a scheduled shift, because he was running late. (ECF No. 60-14, PageID.386–388.) Thus, paragraphs 13 and 14 of Chapp's affidavit are disregarded, but paragraph 11 remains.

### B. Title VII and ELCRA Claims

Title VII prohibits "discrimination in the workplace on the basis . . . of sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 650–51 (2020). Under Title VII, a plaintiff may show discrimination by showing that (1) the "employer engaged in discrete discriminatory acts such as 'termination, failure to promote, denial of transfer, or refusal to hire; or (2) the employer's repeated conduct created a hostile work environment." *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 840 (6th Cir. 2024) (internal quotations omitted). Chapp brings a claim alleging sex discrimination under a constructive discharge theory. He also asserts a hostile work environment claim.

### 1. Sex Discrimination

A plaintiff can establish a prima facie sex discrimination case in one of two ways.[2] First, by providing direct evidence of sex discrimination. *See Yazdian v. ConMed Endoscopic Techs.,*

---

[2] ELCRA claims are analyzed under the same evidentiary framework as claims under Title VII of the Civil Rights Act of 1964. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013) *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).

*Inc.*, 793 F.3d 634, 648 (6th Cir. 2015); *see also Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (quoting *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006)) (defining direct evidence as "evidence that, if believed, dictates a finding, with no need to draw inferences, that unlawful discrimination was at least a motivating factor in the employer's actions").  Second, by providing circumstantial evidence that creates an inference of discrimination.  *See Yazdian*, 793 F.3d at 648; *see also Wexler v. White's Fine Furniture*, 317 F.3d 564, 570 (6th Cir. 2003) (defining circumstantial evidence as "proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference [of discrimination]") (citation omitted).

Where, as here, there is no evidence of direct discrimination, and the plaintiff "relies on circumstantial evidence, the *McDonnell Douglas* burden-shifting framework applies."  *Barrett*, 556 F.3d at 515 (citations omitted).  The plaintiff must show four elements to make a prima facie case under this framework:

> (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.

*Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 414–15 (6th Cir. 2004)).

Here, LSP challenges whether Chapp has provided circumstantial evidence to satisfy the second and fourth elements.  If Chapp cannot produce facts supporting those elements, then LSP is entitled to summary judgment regarding his sex discrimination claims under Title VII and the ELCRA.  *Jamison v. Dow Chem. Co.*, 354 F. Supp. 2d 715, 733 (E.D. Mich. 2004) (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 n.7 (6th Cir. 1994)).

### a. *Similarly-situated employee*

Chapp fails to establish the fourth element of his prima facie case—that similarly situated employees outside the protected class were treated more favorably under the same circumstances. *See Zapata v. URS Energy & Constr., Inc.*, No. 3:13 CV 2203, 2015 WL 3953106, at *6 (N.D. Ohio June 29, 2015). "[I]n analyzing the treatment of similarly situated employees, the question is whether the plaintiff has demonstrate[d] that he or she is similarly-situated to the non-protected employee in all relevant respects." *Snyder v. Pierre's French Ice Cream Co.*, 589 F. App'x 767, 772 (6th Cir. 2014) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521–22 (6th Cir. 2008)). Chapp provides no evidence of a non-protected employee at the Restaurant who was similarly situated to him. Specifically, he has not identified any LSP female employee who dealt with Cutler but was not subject to the same conduct as him. Thus, Chapp fails to establish a prima facie sex discrimination claim under Title VII and the ELCRA.

### 2. Hostile Work Environment

To establish a prima facie hostile work environment claim, Chapp must show: (1) he was a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment created a hostile work environment; and (5) employer liability. *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 411 (6th Cir. 2021); *Hudson v. City of Highland Park*, 943 F.3d 792, 803 (6th Cir. 2019). LSP disputes the second, fourth, and fifth elements.

### a. *Unwelcome harassment*

LSP contends that Chapp has failed to establish the second element of his hostile work environment claim—that he was subjected to unwelcome conduct. Title VII does not prohibit all sexual advances in the workplace. *See Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998); *Jaques v. Herbert*, 447 F. Supp. 2d 858, 867 (N.D. Ohio 2006). Only those advances that

are "unwelcome" fall under the ambit of Title VII.  *Jaques*, 447 F. Supp. 2d at 867.  The inquiry "is whether [the plaintiff] by [his] conduct indicated that the alleged sexual advances were unwelcome."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 58 (1986).  The Court must conduct this inquiry in "light of 'the record as a whole' and 'the totality of circumstances.'"  *Id.* at 69.

Chapp has shown that he regarded Cutler's conduct as undesirable and unwelcome.  When Cutler first touched the top of Chapp's penis, Chapp moved away to the right.  When Cutler touched his penis the second time, Chapp left the area.  About a week later, Cutler texted Chapp flirtatious and highly inappropriate messages that commented on Chapp's body, Chapp's sexuality, and Cutler's attraction to Chapp.  Not even twenty-four hours after receiving those messages, Chapp messaged Tate that he could not "let go" of what Cutler did to him.  (Tate and Chapp Text Messages, PageID.397–98.)  The fact that Chapp moved away from Cutler each time Cutler touched his penis and when coupled with Chapp's messages to Tate—calling Cutler's texts inappropriate and not being able to let this go—show that Chapp did not welcome Cutler's conduct.

### b.  *Severe and pervasive*

LSP contends that Cutler's conduct toward Chapp was not severe or pervasive.  In assessing this element, the inquiry is whether the harassment was objectively "hostile or abusive, and the victim [] subjectively perceive[d] [the] environment as abusive."  *Stewart v. Esper*, 825 F. App'x 8, 20 (6th Cir. 2020).  In other words, "the conduct in question [must be] severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and that the victim subjectively regarded it as abusive."  *Smith v. Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000).

"The alleged incidents of unwelcome harassment are to be considered together to determine whether, under the totality of circumstances, they constitute a hostile work environment."  *Stewart*, 825 F. App'x at 20.  The Court looks to "'all of the circumstances,

including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance.'" *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

Typically, "isolated incidents (unless extremely serious)" will not amount to discriminatory changes in the terms or conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 790 (6th Cir. 2000). The "conduct must be extreme." *Faragher*, 524 U.S. at 788. "In the Sixth Circuit, a single act of sexual assault" may amount to this standard and give rise to an actionable hostile work environment claim.[3] *Hush v. Cedar Fair, L.P.*, 233 F. Supp. 3d 598, 604 (N.D. Ohio 2017) (collecting cases). The Sixth Circuit finds that "acts of touching and unwelcome physical contact . . . establish an element of physical invasion" and "harassment involving an element of physical invasion is more severe than comments alone." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333–35 (6th Cir. 2008).

---

[3] *Compare Ault v. Oberlin Coll.*, 620 F. App'x 395, 402 (6th Cir. 2015) (finding that supervisor's conduct was sufficiently severe as a matter of law, where supervisor shoved employee against shelves in a walk-in cooler, rubbed his genitals against her, and held her in place despite demands that he stop), *Kalich v. AT & T Mobility, LLC*, 679 F.3d 464, 474 (6th Cir. 2012) ("Except in the case of extreme incidents such as rape or *sexual assault*, a single, isolated event  is typically insufficient to create a hostile work environment.") (emphasis added), *and Hush*, 233 F. Supp. 3d at 604 (N.D. Ohio 2017) (denying motion to dismiss hostile work environment claim based on an incident of aggravated sexual assault upon a minor), *with  Bowman v. Shawnee State Univ.*, 220 F.3d 456, 459, 464 (6th Cir. 2000) (dismissing hostile work environment claim where the plaintiff alleged that his supervisor had rubbed his shoulder on one occasion and "grabbed his buttocks" on another, finding that these events, even considered in conjunction with a handful of sexually suggestive comments by the supervisor, were not sufficiently severe or pervasive to create a hostile work environment), *and Burnett v. Tyco Corp.*, 203 F.3d 980, 981 (6th Cir. 2000) (deciding that where the plaintiff alleged that her supervisor "placed a pack of cigarettes containing a lighter inside [the plaintiff's] tank top and brassiere strap," leaving her "stunned, shocked, and exposed," and that he twice made inappropriate, sexually charged comments to her, was not "sufficiently severe or pervasive to support a finding of a hostile working environment").

Here, Cutler's conduct toward Chapp was offensive and inappropriate.  This conduct may not be objectively severe or pervasive enough to create an actionable claim under Title VII where the conduct is directed toward an adult.  *See Bowman*, 220 F.3d at 459, 464.  But, given Chapp's status as a juvenile, Cutler's level of authority, the invasiveness of Cutler's physical conduct, and the sexually suggestive text messages Cutler sent, the Court concludes that a jury could find Cutler's conduct sufficiently severe.  *See, e.g.*, *Gustafson v. Genesco, Inc.*, 320 F. Supp. 3d 1032, 1046–48 (S.D. Iowa 2018) (finding that an older supervisor sending a sixteen-year-old employee "sexually suggestive text messages late at night," threatening to fire her, and slapping her buttocks could constitute an intolerable working environment); and *E.E.O.C. v. Finish Line, Inc.*, 915 F. Supp. 2d 904, 921–22 (M.D. Tenn. 2013) (finding that a thirty-eight-year-old supervisor's constant hugging and poking and touching of a seventeen-year-old employee's stomach was sufficiently severe for a hostile work environment claim).

LSP also argues that Cutler's conduct was not sufficiently pervasive to constitute a hostile work environment.  Chapp began working at the Restaurant for its summer season by at least June 16, 2021.  Not even a month later, Cutler sexually assaulted him.  A week after the assault, Cutler sent text messages commenting on Chapp's body, asking whether Chapp was "gay", and implying his attraction to Chapp.  *See Gustafston, Inc.*, 320 F. Supp. 3d at 1047 (explaining the fact that the instances of sexual harassment "were not isolated events that occurred over many months of time, but instead occurred over a relatively short amount of time" supported a finding of intolerable working conditions).  Unless a short-term employee is never to be able to make out a prima facie hostile work environment claim, circumstances such as this warrant submission to the jury on the issue of pervasiveness.

The Court therefore concludes that Chapp has raised genuine issues of material fact as to whether Cutler's actions were severe and pervasive.

### c.  *Employer liability*

LSP also disputes the final element—employer liability.  "An employer's liability for a hostile work environment under Title VII depends on the status of the harasser."  *Harris v. Detroit Ent., L.L.C.*, No. 20-13403, 2022 WL 6213438, at *7 (E.D. Mich. Sept. 29, 2022).  If a coworker created the hostile work environment, the Court applies a heightened negligence standard.  *Wyatt*, 999 F.3d at 412 (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)).  However, if the harasser was a supervisor, the Court applies "a more stringent standard."  *Ibid.*  Under this latter analysis, an employer can be strictly liable if the harassment "culminates in a tangible employment action."  *Vance*, 570 U.S. at 424.  That said, if there was no tangible employment action, "the employer may escape liability by establishing" the *Faragher-Ellerth* affirmative defense.  *Id.* (citations omitted).  To establish the *Faragher-Ellerth* defense, the employer must prove by a preponderance of the evidence that it (a) "exercised reasonable care to prevent and correct any harassing behavior" and (b) "that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided."  *Id.* (citations omitted).

So, the first question is whether Cutler was Chapp's supervisor.  "For Title VII liability purposes, the Supreme Court defines a 'supervisor' as an employee that has the power 'to take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"[4] *Wyatt*, 999 F.3d at 412-13 (quoting *Vance*, 570 U.S. at 431).

---

[4] Also, "[t]he Supreme Court recognized that a company's hierarchy and reporting structures may not be so easily delineated."  *Wyatt*, 999 F.3d at 413.  "In some cases, when 'decisionmaking power' rests in the hands of 'a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee.'"  *Id.* (quoting *Vance*, 570 U.S. at 447).  "Due to that reliance, an employer 'may be held to have effectively delegated the power to take

Here, Chapp has put forth sufficient evidence to show a genuine issue of material fact as to whether Cutler was his supervisor.  First, Tate stated that any interested candidates who sought employment with the Restaurant were authorized to be hired by any member of management, and other members of management could "interview, process, and onboard new employees."  (Tate Decl. ¶ 30.)  That apparently includes Cutler, who was a floor manager at the time.  Second, the record shows that Cutler hired Chapp.  Cutler—not Tate or Mulvaney—met and interviewed Chapp for fifteen to twenty minutes.  Further, Chapp worked his first shift at the Restaurant a mere three days after the interview.  Thus, even if Cutler was not technically making the final employment decision, he still played a significant role in Chapp being hired.

In addition, Chapp explained that he believed Cutler controlled and oversaw his "schedules, duties and work times."  (Chapp Decl. ¶ 11.)  For example, Chapp texted Cutler, "Hey Tony, gonna be running a little late today. Is it alright if I come in around 6-6:30. Maybe even sooner if I get back in time[,] I'm a busser[.]"  (ECF No. 60-14, PageID.386.)  Cutler asked Chapp who he was working with, and Chapp said "Roy."  (*Id.*, PageID.387.)  Cutler responded, "Yes that's fine."  (*Id.*, PageID.388.)  Another time, Chapp texted Cutler about getting his bonus check, "Hey Tony, I'm heading out for Hawaii around 5-6pm.  Anyway I can grab the bonus checks before I leave!!!!"  (*Id.*, PageID.390.)  Cutler responded, "You and little Ryan can come over now[.]"  (*Id.*, PageID.391.)  Thus, viewing the record in a light most favorable to Chapp, the Court concludes that a jury could find that Cutler acted as Chapp's supervisor.

Resisting the conclusion that there is a genuine issue of fact as to Cutler's supervisory role, LSP relies on *Equal Emp. Opportunity Comm'n v. AutoZone, Inc.*, 692 F. App'x 280 (6th Cir. 2017).  In its unpublished opinion in *AutoZone*, the Sixth Circuit found that Townsel (the harasser)

---

tangible employment actions to the employees on whose recommendations it relies.'  *Id.* (quoting *Vance*, 570 U.S. at 447).

was not the victims' supervisor for Title VII purposes because, for one reason, he did "not hire [the victims]" as they were already employed at AutoZone. *Id.* at 283–84 ("It makes no difference that Townsel could hire other hourly employees. Townsel *could not* and *did not* hire the employees he harassed, and that's what matters under *Vance.*"). *AutoZone* does not compel a different conclusion, because viewing the evidence in the light most favorable to Chapp, Cutler *did* hire Chapp. *See id.*

### d. *Faragher-Ellerth defense*

Next, the Court considers LSP's argument that Chapp cannot overcome its *Faragher-Ellerth* defense.

Generally, when a supervisor, as opposed to a coworker, engages in sexual harassment, the employer may be strictly liable for that conduct if it culminates in a tangible employment action. *Vance*, 570 U.S. at 424. But if the harassment does not result in a tangible employment action, the employer may be protected under the *Faragher-Ellerth* framework. *Id.*

Here, Chapp suffered no tangible employment action to hold LSP strictly liable. A tangible employment action includes discharge, demotion, undesirable reassignment, and any other significant change in employment status or a decision causing a significant change in benefits. *Penn. State Police v. Suders*, 542 U.S. 129, 137, 144 (2004). Notably, the Supreme Court in *Suders* held that a constructive discharge—where the supervisor's behavior involved no official actions—does not amount to a tangible employment action in the context of *Faragher-Ellerth*. *Id.* at 140, 148; *see Plautz v. Potter*, 156 F. App'x 812, 819 (6th Cir. 2005) (stating *Suders* held a "constructive discharge . . . is not a 'tangible employment action' in sexual harassment cases"). Moreover, none of Cutler's actions that are at issue were official acts as a floor manager of the Restaurant. The affirmative defense is therefore available to LSP.

18

To avail itself of the affirmative defense, LSP must show that (1) it "exercised reasonable care to prevent and correct any harassing behavior" and (2) Chapp "unreasonably failed to take advantage of the preventive or corrective opportunities" that LSP provided. *Vance*, 570 U.S. at 424; *see also Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 348 (6th Cir. 2005).

i.  *Prompt and corrective action*

"Steps that would 'establish a base level of reasonably appropriate corrective action' may include promptly initiating an investigation[,] . . . 'speaking with the specific individuals identified'" in the complaint, "following up with the complainant," and "reporting the harassment to others in management." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013) (alteration omitted) (quoting *West v. Tyson Foods*, 374 F. App'x 624, 633 (6th Cir. 2010)).

Even in reviewing the facts in the light most favorable to Chapp, LSP exercised reasonable care to promptly prevent and correct any sexually harassing behavior.  After Chapp shared his concerns regarding the incident and text messages, LSP immediately investigated.  After Chapp's initial message to Tate, Tate texted Chapp follow-up questions to learn more information about when and where the alleged inappropriate touching occurred, and who may have witnessed it.  The following day, LSP informed Cutler of Chapp's allegations against him and ordered him to cease contact with Chapp, the Restaurant, and any other Restaurant employees.  On July 27, 2021, about seven to eight days after Chapp informed LSP of the harassment, and while Chapp was still in Hawaii, LSP terminated Cutler's employment.  It came to this decision after talking to Chapp, investigating his allegations, discussing the allegations with Cutler, and finding that no efforts short of Cutler not working at the Restaurant again would remedy the situation.

LSP then notified Chapp that Cutler was no longer employed at the Restaurant and requested a meeting to determine next steps.  Tate specifically requested that LSP management, Chapp, and Chapp's parents conduct a discussion once they return from Hawaii.  She also asked

19

Chapp if he felt comfortable returning to work, knowing that Cutler would no longer be around. Chapp told Tate that he needed time to think about returning.  A few weeks later, Chapp communicated to Tate that he did not feel comfortable returning but gave no reason why.

The Court finds LSP's investigation, process, conclusion, and follow-up was prompt and reasonable concerning Chapp's allegations.  *See, e.g.*, *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 685–86 (6th Cir. 2005) (finding employer's response was prompt and corrective where harasser was terminated six days after complaint); and *Doe v. City of Detroit*, 3 F.4th at 301 (finding prompt and corrective action where defendant immediately launched an investigation after becoming aware of alleged harassment); and *Mullins v. Goodyear Tire & Rubber Co.*, 291 F. App'x 744, 749 (6th Cir. 2008) (concluding employer acted reasonably when it "reacted immediately" to harassment complaint, "launched a two-week investigation, interviewed the parties involved, and instructed [the harasser] not to bother [the complainant]"); and *Newton v. Ohio Dep't of Rehab. & Corr.-Toledo Corr. Inst.*, 496 F. App'x 558, 565 (6th Cir. 2012) (determining employer acted reasonably when it "immediately began an internal investigation, . . . scheduled meetings with Plaintiff's supervisors to discuss the incident in detail, interviewed witnesses, including [the harasser], and prepared a separate report of its findings).

### ii.    *Take advantage of preventive or corrective opportunities*

The *Faragher-Ellerth* defense also requires an employer to show that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Collette,* 126 F. App'x at 682.

Chapp failed to take advantage of the corrective opportunity LSP provided.  As stated, LSP adequately corrected the hostile environment by conducting a thorough investigation, informing Chapp that it took his allegations seriously, terminating Cutler's employment, and requesting that any other allegations be raised to Tate or a different manager.  LSP therefore afforded Chapp the

opportunity to return to the Restaurant without facing or working with Cutler.  Chapp instead notified LSP he would not be returning to the Restaurant.  He gave LSP no reason or basis. Accordingly, Chapp failed to take advantage of the corrective opportunity.  *See Collette*, 126 F. App'x at 686–87 (affirming summary judgment for the employer where the harasser was terminated six days after the complaint and employee declined to return to work).

He avers now—approximately three and half years after the investigation—that he did not feel comfortable returning to the Restaurant because Cutler lived next door and frequented the Restaurant.  Chapp failed to bring this concern to LSP during the relevant period.  *See Thornton v. Fed. Express Corp.*, 530 F.3d 451, 457–58 (6th Cir. 2008) (employer satisfied second prong where "the record does not . . . [show] plaintiff's contention that she was unable to return to work . . . or demonstrate[] that any continuing difficulties were caused by any inadequacy in FedEx's preventive or corrective measures.")  As a result, he failed to take advantage of the corrective opportunity provided.  Accordingly, LSP satisfies the second prong of the defense.

LSP has established its *Faragher-Ellerth* affirmative defense to employer liability.  The Court therefore grants summary judgment to LSP on Chapp's hostile work environment claims.

### iii.    *Sexual harassment policy*

Much of Chapp's argument rests on LSP allegedly failing to disseminate and enforce the Policy.  These arguments carry no weight.

For one, the record supports the finding that LSP did distribute the Policy to Chapp.  Chapp acknowledged on June 16, 2021 that he received, read, and understood the contents of the Policy by signing his name to the form.

Secondly, the Policy instructs employees to report harassment or discrimination either to the Restaurant manager or the owner.  In this case, Chapp directly texted the Restaurant's manager at the time, Christine Tate.  Chapp's text messages with Tate show that he had access to a direct

and informal way to report Cutler's harassment.  In their text exchange, Tate expressed to him that if he ever "feel[s] uncomfortable make sure you go to a manager on duty so they can take care of it right away."  (ECF No. 60-20, PageID.435.)  Therefore, Chapp's argument that the Policy was ineffective fails.

### C. Supplemental Jurisdiction

As discussed, Chapp also alleged state law tort claims of assault and battery and intentional infliction of emotional distress.  Ordinarily, where a district court has exercised jurisdiction over a state law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims.  *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims."); *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).  In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues."  *Landefeld*, 994 F.2d at 1182; *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues.") (internal quotation marks omitted).  Dismissal, however, remains "purely discretionary."  *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)).  Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction over the state tort claims. Accordingly, Chapp's state law tort claims are properly dismissed without prejudice.  A Judgment will enter consistent with this Opinion and Order.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Defendant 202 Lake Street Partners, LLC's motion for summary judgment (ECF No. 59) is **GRANTED** in regard to Chapp's sex discrimination and hostile work environment claims under Title VII and ELCRA (Counts I, II, and III).

**IT IS FURTHER ORDERED** that Chapp's state law tort claims of assault and battery and intentional infliction of emotional distress (Counts IV[5] and V) are **DISMISSED WITHOUT PREJUDICE.**

Dated:   June 12, 2025                         /s/ Jane M. Beckering
                                                JANE M. BECKERING
                                                UNITED STATES DISTRICT JUDGE

---

[5] Counts IV and V are labeled, in the Complaint, as a second Count III and as Count IV.